**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                                        )
FLORENCE McCORMICK,                     )
                                                        )
                    Plaintiff,                       )
          v.                                            )
                                                        )          Case No. 18-cv-1704 (CKK)
ANDREW SAUL,                                  )
Commissioner of                                 )
the Social Security Administration,[1]      )
                                                        )
                    Defendant.                     )
_____ )

**MEMORANDUM OPINION**
(June 25, 2021)

        Pending before this Court are Plaintiff's [11] Motion for Judgment of Reversal (Pl.'s Mot.);

Defendant's [12/13] [Consolidated] Motion for Judgment of Affirmance and Opposition to

Plaintiff's Motion for Judgment of Reversal ("Def.'s Mot."); and Plaintiff's [14] Reply to

Defendant's Motion for Judgment of Affirmance ("Pl.'s Reply").[2]  Plaintiff Florence McCormick

("Plaintiff" or "Ms. McCormick") requests reversal of the Decision by the Acting Commissioner

of the Social Security Administration ("SSA") to deny Plaintiff's application for Title II disability

and disability insurance benefits.  Plaintiff alleges that the Administrative Law Judge ("ALJ") who

issued the Decision erred insofar as she: (1) failed to give controlling weight to the opinion of

_____

[1] Pursuant to Fed. R. Civ. P. 25 (d),  Andrew Saul, Commissioner of the Social Security
Administration has been automatically substituted for Nancy Berryhill, Acting Commissioner of
the Social Security Administration, whom the parties' pleadings name as Defendant.

[2] In issuing this Opinion and the accompanying Order, this Court has considered the parties'
motions as well as the entire Administrative Record ("AR"), ECF No. 9.  In an exercise of its
discretion, the Court finds that holding oral argument in this action would not be of assistance in
rendering a decision.  *See* LCvR 7(f).

Plaintiff's treating physician; (2) made a finding that Plaintiff's testimony was inconsistent with the record, which was not supported by substantial evidence; (3) failed to provide substantial evidence for her residual functional capacity ("RFC") finding; and (4) failed to adequately develop the record by refusing to leave the record open for additional evidence. *See generally* Pl.'s Mot., ECF No. 11, at 9-20.

Upon consideration of the pleadings, and for the reasons set forth herein, the undersigned finds that one of Plaintiff's four arguments – that the ALJ failed to give controlling weight to Plaintiff's treating physician without sufficiently explaining why – warrants remand of the Defendant's decision. Accordingly, the Court DENIES IN PART AND GRANTS IN PART Plaintiff's Motion for Judgment of Reversal, DENIES Defendant's Motion for Judgment of Affirmance, and REMANDS this matter to the Social Security Administration for further proceedings solely on that issue.

## I. Background

Plaintiff Florence McCormick, who resides in Washington, D.C., was 55 years old as of her disability onset date of October 19, 2008, and 59 years old as of December 31, 2012, her date last insured. (Administrative Record ("AR") 236, 262.)[3] She has a high school diploma, and her work history includes working: (1) for the District of Columbia Parking Authority, primarily placing "boots" on cars; (2) as a cleaner and receptionist for Jackson Hewitt; (3) as a cashier at Whole Foods; (4) at Dudley Beauty College, doing administrative work and restocking shelves; and (5) driving a transport van for Metro Access. (AR 82-84, 280-81, 304.)

---

[3] The Court references the page numbers located at the bottom righthand corner of the administrative record. When referring to motions, the Court references the page numbers assigned by the Electronic Case Filing ("ECF") system.

In November 2013, Plaintiff filed an application for Disability Insurance Benefits under Title II of the Social Security Act (the "Act"), 42 U.S.C. §§401-434, alleging disability beginning on October 19, 2008 due to high blood pressure, kidney damage, and scoliosis. (AR 209-215, 239-246.) The SSA denied Plaintiff's application initially and upon reconsideration. (AR 111-12, 123.) On December 7, 2016, Plaintiff – who was represented by counsel - appeared for an administrative hearing and testified before an ALJ. (AR 62-93.) ALJ Francine Applewhite issued her Decision on February 13, 2017, whereby she denied Plaintiff's application and found that Ms. McCormick was not disabled before her date last insured of December 31, 2012 (AR 50-57.) After the Appeals Council denied Plaintiff's request for review, ALJ Applewhite's Decision became the final agency decision. Plaintiff requests judicial review in this Court under 42 U.S.C. § 405(g).

**A. Evidence Before the ALJ**

The evidence before ALJ Applewhite consisted primarily of: (1) medical records spanning from 2009 through 2014, including medical records from doctors who treated Plaintiff and reports from state agency physicians; and (2) testimony by Plaintiff and by Dr. James M. Ryan, a vocational expert, during the hearing held by the ALJ.

1. Plaintiff's Medical Records

This Court has reviewed the medical records cited by the ALJ in her Decision as well as the medical records in the Administrative Record relevant to Plaintiff's scoliosis and kidney disease, and those records are summarized below.[4] During the relevant period between her alleged

---

[4] The ALJ treated Plaintiff's scoliosis and kidney disease as "severe impairments." (AR 52.) Defendant's summary of medical records provided page number citations to the Administrative Record. On the other hand, some of Plaintiff's cites to the Record were difficult to follow. For example, in her Motion, ECF No. 11, at 5, Plaintiff cited to "R. at 307" in support of several allegations, but R. 307 is one page of a multi-page summary that was prepared in connection with an appeal of the denial of Plaintiff's disability benefits. That page, in turn, references

disability onset of October 19, 2008 and her date last insured of December 31, 2012, Plaintiff received primary care treatment at Congress Heights Health Center ("Congress Heights") where her primary care physician was Jamie Hill-Daniels, M.D.

a. Scoliosis

Plaintiff was first diagnosed with scoliosis (curvature of the spine) when she was "around 18 years old." (AR 75.) When examined at Howard University's Department of Radiology on August 31, 2009, Ms. McCormick had a spine curvature of 46 degrees (AR 387.) On September 14, 2009, Ms. McCormick was seen by Dr. Hill-Daniel, and Plaintiff self-reported that she "had to quit [her job] as it was too painful to stand up all day[.]" (AR 364.) Plaintiff was instructed to get an MRI of her neck that week.[5] (AR 364.)

Plaintiff was prescribed acetaminophen for her scoliosis at an August 25, 2011 visit with Dr. Hill-Daniel, (AR 334), while she had previously been prescribed ibuprofen for her scoliosis. (AR 353, 355.) On November 15, 2011 Ms. McCormick presented to Dr. Hill-Daniel and requested a screening examination for scoliosis. (AR 330.) A November 21, 2011 radiology report from Howard University Hospital indicated a "thoracal lumbar spine" curvature of 53 degrees, no cervical scoliosis, and no evidence of acute fracture or subluxation. (AR 379.)

On April 11, 2013, Plaintiff reported to Dr. Hill-Daniel that she was "having more back pain," which was "affecting her ability to work at this point," and she had "been less active." (AR 600.) Plaintiff was referred to an orthopedist, Dr. Joseph O'Brien, with regard to her scoliosis. (AR 601.) A May 7, 2013 MRI of Ms. McCormick's thoracic spine from the United Medical Center showed an approximately 50-degree curvature in her lower thoracic spine, with "no

---

exhibits such as an "Exhibit Submitted on November 22, 2010." This Court did not undertake to cross-reference Defendant's citations to exhibits.
[5] There is no indication in the medical records that this was done.

significant disc bulge or disc herniations [or] central stenosis." (AR 440.) On May 21, 2013, Plaintiff presented to Dr. O'Brien, at the George Washington University Medical Faculty Associates, Department of Orthopaedic Surgery, where she self-reported significant pain over the past few years, mostly in her low to mid-back and neck, which worsened with lifting and extended standing and improved with stretching and brief walks. (AR 459.) During that visit, Plaintiff also reported some urinary urge incontinence. (AR 459.) Plaintiff was deemed to be "in no apparent distress" and her [mo]od [was pleasant." (AR 460.) No edema [swelling caused by excess fluid] was noted, and her strength was 5/5 and she had "normal sensation on gross exam." (AR 460.) Imaging showed "moderate" scoliosis in the lower thoracic spine (around 50 degrees), with "minimal degenerative disc disease" and "[n]o central stenosis or disc herniation." (AR 460.) Spinal x-rays showed approximately 70-degree thoracolumbar scoliosis. (AR 460.) As part of her social history, it was noted that Plaintiff's "activities and hobbies include[d] brief walk[s], short bike rides, reading and listening to music." (AR 460.) "[C]onservative treatment" was prescribed, including "physical therapy as well as the Spine Center for pain management" and a recommendation for annual follow-ups, or more frequently if her symptoms became significantly worse. (AR 460.)

    b. Kidney Disease (including discussion of edema)

    On August 20, 2009, Plaintiff presented to Dr. Hill-Daniel for a follow-up on a complaint of leg swelling, which she stated was relieved by rest and elevating her legs. (AR 368.) Doctor Hill-Daniel noted that Plaintiff's extremities were without clubbing, cyanosis or edema. (AR 368.) On March 5, 2010, Plaintiff presented to Dr. Hill-Daniel for a follow-up visit pertaining to her chronic medical issues and to obtain a refill of her prescriptions. (AR 353.) Plaintiff requested a work release and complained of "pain in side and not urinating as frequently as she should." (AR

353.)  The medical records indicate that Plaintiff's urology was negative for stress and urge incontinence.  (AR 353.)  Plaintiff received a prescription for Lasix (furosemide) for treatment of her renal problems, and she was instructed to follow up in 3 months.[6]  (AR 352.)  On November 5, 2010, Plaintiff visited Dr. Hill-Daniel for a follow-up on her medical conditions and to get prescriptions refilled.  (AR 344-345.)  With regard to her kidney function, the doctor counseled Plaintiff regarding a low protein diet and change in medication to try to stabilize Plaintiff's elevated creatine, and Plaintiff was referred to radiology and the Nephrology Clinic.  (AR 345.)

On July 12, 2011, Plaintiff had a walk-in visit at Congress Heights, and she requested a refill of medication because of the swelling in her legs, but the attending doctor noted that Plaintiff was "taken off this secondary to abnormal kidney function tests." (AR 339.)  Furthermore, Plaintiff had been referred for radiologic testing and nephrology in the fall, "but she never did these."  (AR 339.)  Plaintiff was counseled to comply with the medical orders and to follow up in four weeks. (AR 341.)  On July 21, 2011, Plaintiff went to the emergency department at the George Washington University Hospital, and she complained of leg swelling and flank pain.  While she was being treated there, the nurses noted that she ambulated "with a steady gait."  (AR 648, 650.) Ms. McCormick was diagnosed with edema, but she was not given any medication because of her kidney function issues. (AR 640-641.)[7]  The following day, Plaintiff visited Congress Heights as a walk-in patient regarding her leg swelling.  (AR 336.)  Edema was noted in Plaintiff's

---

[6] At that point, Plaintiff was prescribed Norvaac and Hydrochlorothiazide for her hypertension; Claritin and Flunisolidc Solution for her allergies; Zocor for her elevated cholesterol; Ibuprofen for her scoliosis; and Amitriptyline to be taken at bedtime and Diflorasone Diacetate Cream to apply to the "affected area." (AR 353-355.)

[7] Medical records from November 2011, October 2012, and April 2013 indicate that Plaintiff was prescribed Furosemide for her edema. (AR 331, 325-326, 453.)

extremities, and there was a recommendation of support stockings, elevation, and a trial of a diuretic, with a follow-up visit to be scheduled in 2-3 weeks.  (AR 337-338.)

Plaintiff's August 15, 2011 radiology examination indicated "[b]orderline small size kidneys with evidence of mild renal disease." (AR 385-386.)  On October 5, 2012, Plaintiff visited Dr. Hill-Daniel for a check-up, and she indicated that she wanted to get another opinion about her kidney prognosis, so she was referred to nephrology.  (AR 325-326.)  On October 22, 2012, Ms. McCormick consulted with Dr. Scott Cohen, a nephrologist, for evaluation of her chronic kidney disease. (AR 435-437.)  Plaintiff reported occasional lower back pain for the past two years, which had become duller in nature, and she indicated that she passed a kidney stone in 2000.  (AR 435.)  Plaintiff denied urinary symptoms such as dysuria or urinary urgency.  (AR 435.)  Dr. Cohen opined that Plaintiff's chronic low back pain was "[l]ikely musculoskeletal" and that she should continue "conservative" treatment.  (AR 436.)  Plaintiff's plan of care for her kidneys included getting a renal ultrasound, following a low sodium diet, avoiding NSAIDs, and returning for another visit in 3 months. (AR 436.)  The renal ultrasound "came out normal" with no evidence of cysts or stones.  (AR 494-495.)

Plaintiff had a follow-up visit with Dr. Cohen in June 2013, where Plaintiff showed no arthralgia, myalgia, numbness, or muscle weakness.  (AR 446.) Plaintiff was advised to repeat the chemistries to assess her renal function, maintain a low sodium diet, avoid NSAIDs, and return in 3 months.  (AR 447.) Plaintiff followed up with Dr. Cohen again in September 2013, and her medical records indicated that Plaintiff's creatinine levels had remained stable since she was first informed of her chronic kidney disease in approximately 2008.  (AR 531.)  Plaintiff denied urinary urgency and edema and reported that she had experienced occasional lower back pain and left side flank pain for the past 2 years.  (AR 531.)  Plaintiff was assessed with chronic kidney disease stage

3b, and she was advised to repeat the chemistries to assess her current renal function, maintain a low sodium diet and avoid NSAIDs. (AR 533.) Ms. McCormick was also advised to return to the renal office for a follow-up visit in 3 months. (AR 533.) Dr. Cohen noted that his review of Plaintiff's recent laboratory studies showed "stable moderate kidney impairment[.]" (AR 471.) Dr. Cohen indicated subsequently, in February 2014, that Ms. McCormick's test results from her then-recent lab studies were "stable and continue to show chronic mildly reduced kidney function." (AR 520.)

 2. Testimony at the Administrative Hearing

 Plaintiff reported that she stopped working in December 2008 (AR 240) because of back pain, headaches, vision problems, and swelling of her legs. (AR 78). Ms. McCormick testified that the pain left her bedridden (AR 73, 85), but her earning records show that she continued working into 2009. (AR 228, 230, 233.) Plaintiff testified that she was diagnosed later with kidney disease and advised that she needed to drink up to a gallon of water a day, and she began having incontinence in public. (AR 79, 97.)

 During the relevant period, Plaintiff resided in a third floor apartment in the District of Columbia, which required her to walk up nine steps. (AR 69-70.) Plaintiff had a driver's license, but she did not have a vehicle to drive. (AR 70.) In order to get medical appointments or to work, Ms. McCormick used "medical transportation" and public transportation including the bus (the bus stop was one block away) and the metro. (Tr. 70-71, 73.) Plaintiff testified that she would have to stop and rest after about a half block while walking. (AR 77.) Ms. McCormick indicated further that she did no household chores; her son or neighbors would go grocery shopping for her, (AR 74), and sometimes her pain was so bad that she would just stay in bed. (AR 78.) Plaintiff testified that, by 2012, she could not work due to the debilitating pain. (AR 85.)

### B. Legal Framework for Determining Disabilities

An individual must have a "disability" to qualify for disability benefits under the Social Security Act (the "Act"). *See* 42 U.S.C. § 423 (a). Under the Act, a "disability" is defined as a condition that renders the applicant unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The impairment must be "of such severity that [the applicant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). A claimant must support her claim of impairment with "[o]bjective medical evidence" that is "established by medically acceptable clinical or laboratory diagnostic techniques." 42 U.S.C. § 423(d)(5)(A).

The SSA has established a five-step sequential analysis for determining whether a claimant is disabled and entitled to disability benefits. *See* 20 C.F.R. § 404.1520. At step one, the claimant must show that she is not presently engaged in substantial gainful employment. *Id.* § 416.920(a)(4). If the answer is yes, the ALJ will find that the claimant is not disabled. *Id.* § 416.920(a)(4)(i). If the answer is no, the ALJ moves to step two, where the claimant must show that she has a "severe medically determinable physical or mental impairment" or a combination of severe impairments that meets certain duration requirements under the regulations. *Id.* § 416.920(a)(4)(ii). If the claimant has such impairment or impairments, the analysis will move to step three, where the claimant must show that her impairment meets or equals an impairment listed in the Listing of Impairments, 20 C.F.R. § 404, Subpart P, Appendix 1 ("Listing of Impairments").

*Id.* § 416.920(a)(4)(iii). If her impairment is listed, then she is conclusively presumed disabled and the inquiry ends here. *Id.* § 416.920(d).

If the impairment is not listed, the ALJ continues to step four to assess the claimant's residual functional capacity ("RFC") and "past relevant work." 20 C.F.R. § 416.920(a)(4)(iv). In determining a claimant's RFC, the ALJ must consider the tasks that can be performed by a claimant despite any physical or mental limitations, and the ALJ will evaluate medical, physical and mental factors; the claimant's descriptions of impairments and limitations; relevant medical evidence; and other relevant evidence. 20 C.F. R. §404.1545. The claimant must show that her impairment prevents her from performing her "past relevant work." 20 C.F.R. § 416.920(a)(4)(iv). If the claimant remains capable of doing past relevant work, the ALJ will find the claimant is not disabled. *Id.* If the ALJ determines that the claimant is not capable of doing his past relevant work, the ALJ's analysis moves to step five, the final step, to assess whether there is other work that the claimant could do, considering the claimant's "residual functional capacity, . . . age, education, and work experience." 20 C.F.R. § 416.920(a)(4)(v). If the ALJ determines that the claimant is not capable of adjusting to other work, the ALJ will find that the claimant is disabled. *Id.*

The claimant bears the burden of proving the first four steps, and then the burden shifts to the Commissioner at step five to produce evidence of jobs that the claimant can perform. *See Butler v. Barnhart*, 353 F.3d 992, 997 (D.C. Cir. 2004); *see also Smith v. Astrue*, 935 F. Supp. 2d 153, 158 (D.D.C. 2013) (Kollar-Kotelly, J.). The Commissioner typically offers this evidence through the testimony of a vocational expert responding to a hypothetical that incorporates the claimant's vocational factors and RFC. If the claim survives these five steps, then the claimant is deemed disabled and qualifies for disability benefits. *See* C.F.R. § 404.1520(a)(4).

**C.  The ALJ's Decision**

On February 13, 2017, ALJ Francine L. Applewhite issued a decision finding that Plaintiff was not entitled to disability benefits. (AR 50-57.)  At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since her alleged onset date of October 19, 2008 through her date of last insured of December 31, 2012.  At step two, the ALJ found that Plaintiff had the following severe impairments: "scoliosis and kidney disease."  (AR 52.)

At step three, the ALJ evaluated Plaintiff's physical and mental impairments – scoliosis and kidney disease -  and determined that Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.  (AR 52-53.) With regard to Plaintiff's scoliosis, the ALJ noted that there was "no operative or pathology report of tissue biopsy, or appropriate medically acceptable image showing spinal arachnoiditis" and "no evidence of nerve root compression . . . or motor loss."  (AR 53.)  Plaintiff was "able to ambulate effectively[.]" (AR 53.)   With regard to Plaintiff's kidney disease, the ALJ noted that "medical evidence does not demonstrate the required laboratory findings during a 12-month period at least 90 days apart" nor was there "evidence of renal osteodystrophy, peripheral neuropathy, fluid overload syndrome, or anorexia[.]"  (AR 53.)  Plaintiff received "minimal treatment during the period at issue and an ultrasound . . . was noted to be normal."  (AR 53.)

Accordingly, the ALJ moved to step four, where she found that Plaintiff had the "residual functional capacity to perform light work as defined in 20 CFR 404.1567(b)," except that she could

only occasionally climb ladders, ropes, scaffolds, ramps, or stairs, and stop, crouch, crawl or kneel. (AR 53.)

At this step, the ALJ indicated that she considered Plaintiffs' symptoms, the "extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence," and opinion evidence, as required pursuant to the SSA regulations. (AR 53.) In her analysis, the ALJ determined that while "the claimant's medically determinable impairments could reasonably be expected to produce [her] alleged symptoms[,]" her "statements concerning the intensity, persistence and limiting effects of these symptoms [were] not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in [her] decision." (AR 54.) The ALJ considered and weighed the following information: (1) the conservative nature of the treatment rendered for Plaintiff's scoliosis, and the opinion of the treating source that Plaintiff's scoliosis is very well managed with physical therapy and did not warrant surgical intervention; (2) the medical evidence relating to kidney function tests and medical imaging that document mild kidney disease and the minimal treatment Plaintiff received, other than monitoring, from the alleged onset through the date last insured, as well as the normal kidney ultrasound; (3) Plaintiff's denial of urinary symptoms, which was contradicted by her testimony; and (4) the fact that Plaintiff worked after the alleged onset date and reported that she is able to go on short walks and bike rides and climb the stairs to her apartment, which demonstrates a higher level of activity than alleged by her. (AR 53-55.) [8]

Furthermore, the ALJ assigned the following weights to medical provider opinion evidence: (1) some weight to the assessment of state agency medical consultant Dr. James Grim;

_____

[8] The ALJ noted that Plaintiff's work in 2009 "did not rise to the presumptively disqualifying level of substantial gainful activity . . . " (AR 54.)

(2) some weight (more than given to Dr. Grim) to the assessment of state agency medical consultant Dr. Fizzeh Nelson-Desiderio; (3) some weight to the opinion of Plaintiff's treating physician, Dr. Jamie Hill-Daniel; and (4) little weight to the opinion of the consultative examiner, Dr. Eugene Miknowski. (AR 55.)  The ALJ accepted the testimony of the vocational expert, Dr. James M. Ryan, who found that Plaintiff was able to perform her past relevant work as a cashier, receptionist and office cleaner, both as actually and normally performed. (AR 56.)  The ALJ concluded that Plaintiff was not under a disability, as defined in the Social Security Act, at any time from October 19, 2008, the alleged onset date, through December 31, 2012, the date last insured.  (AR 56.)

## II. Standard of Review

The Social Security Act, 42 U.S.C. § 405(g), permits a plaintiff to seek judicial review, in a federal district court, of "any final decision of the Commissioner of Social Security made after a hearing to which he was a party."  *See also Contreras v. Comm'r of Social Security*, 239 F. Supp. 3d 203, 206 (D.D.C. 2017).  This Court must uphold the Commissioner's determination "if it is supported by substantial evidence and is not tainted by an error of law." *Smith v. Bowen*, 826 F.2d 1120, 1121 (D.C. Cir. 1987); *see also* 42 U.S.C. § 405(g). Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citation omitted).  The substantial evidence test requires "more than a scintilla, but . . . something less than a preponderance of the evidence." *Fla. Mun. Power Agency. v. FERC*, 315 F.3d 362, 365–66 (D.C. Cir. 2003). A court may not re-weigh the evidence or supplant the SSA's judgment of the weight of the evidence with its own. *Maynor v. Heckler*, 597 F Supp. 457, 460 (D.D.C. 1984); *Cunningham v. Colvin*, 46 F. Supp. 3d 26, 32 (D.D.C. 2014) (quotation omitted) (same).

Instead, a court must scrutinize the entire record and give "considerable deference to the decision rendered by the ALJ and the Appeals Council." *Crawford v. Barnhart*, 556 F. Supp. 2d 49, 52 (D.D.C. 2008). Despite the deferential nature of the standard, courts must give the record "careful scrutiny" to "determine whether the Secretary, acting through the ALJ, has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits." *Simms v. Sullivan*, 877 F.2d 1047, 1050 (D.C. Cir. 1989) (citations and internal quotation marks omitted). An ALJ may not "merely disregard evidence which does not support his conclusion." *Martin v. Apfel*, 118 F. Supp. 2d 9, 13 (D.D.C. 2000) (citation omitted). "A reviewing court should not be left guessing as to how the ALJ evaluated probative evidence," and it is "reversible error for an ALJ to fail in his written decision to explain sufficiently the weight he has given to certain probative items of evidence." *Id.* (citations omitted); *see Simms*, 877 F.2d at 1050.

### III. Analysis

As previously noted, Plaintiff contends that the ALJ: (1) failed to give controlling weight to the opinion of Plaintiff's treating physician; (2) made a finding that Plaintiff's testimony was inconsistent with the record, which was not supported by substantial evidence; (3) failed to provide substantial evidence for her residual functional capacity finding; and (4) failed to adequately develop the record by refusing to leave the record open for additional evidence. *See generally* Pl.'s Mot., ECF No. 11, at 9-20. Each of these arguments will be addressed in turn.

### A. The Weight Given to the Opinion of Plaintiff's Treating Physician is Not Sufficiently Explained

Pursuant to the "treating physician rule," which applies to Social Security disability benefits cases, "when a claimant's treating physician[ ] ha[s] great familiarity with [her] condition, [his] reports must be accorded substantial weight, [and] such an opinion by a treating physician is

binding on the factfinder unless contradicted by substantial evidence." *Holland v. Berryhill*, 273 F. Supp. 3d 55, 63 (D.D.C. 2017) (citing *Butler v. Barnhart*, 353 F.3d 992, 1003 (D.C. Cir. 2004) (quotation and internal quotation marks omitted)). A treating physician's medical opinion is entitled to "controlling weight" if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with other substantial record evidence. 20 C.F.R. §§ 404.1527(c)(2); 416.927(c)(2); *see also Butler*, 353 F.3d at 1003 ("A treating physician's [opinion] is binding on the fact-finder unless contradicted by substantial evidence.") Generally, the ALJ will also give more weight to a physician if the physician has had a longer treatment relationship with the plaintiff, a higher frequency of examination of the plaintiff, or a specialty in a relevant medical area. *See* 20 C.F.R. § 404.1527(c).

The ALJ "need not treat [treating physicians' opinions] as controlling if they are contradicted by substantial evidence and the ALJ explains why she is not following them." *Callaway v. Berryhill*, 292 F. Supp. 3d 289, 294-295 (D.D.C. 2018) (holding that the ALJ had substantial evidence to support a decision to afford the treating physicians' opinion some weight, but not controlling, because the physicians' testimonies were divergent as to the stress levels of the claimant and their findings conflicted with other medical evidence). Thus, where an ALJ does not afford a treating physician's testimony controlling weight , the ALJ must "apply a series of factors to determine what weight should be granted to those opinions." *Porter v. Colvin*, 951 F. Supp. 2d 125, 132 (D.D.C. 2013). These factors are "(1) examination relationship; (2) treatment relationship; (3) length and nature of treatment; (4) supportability of treating physician's opinion by medical sources; (5) consistency of the opinion with the record as a whole; (6) whether the opinion was rendered by a specialist; and (7) other evidence brought to the attention of the ALJ." *Id.* The ALJ need not reference each of these six factors; instead, the ALJ only needs to provide

"good reasons" for according less than substantial weight to the treating physician's findings. *Turner v. Astrue*, 710 F. Supp. 2d 95, 106 (D.D.C. 2010) (quoting 20 C.F.R. §§ 404.1527(d)(2), 416.927 (d)(2)).

In the instant case, the ALJ considered the opinions of Drs. Hill-Daniel, Miknowski, Grim, and Nelson-Desiderio.[9]  Dr. Hill-Daniel completed a medical examination report on September 14, 2009, (AR 637-6398), where he opined that Plaintiff could lift up to twenty-five pounds, but only ten pounds frequently.  (AR 638.)  He indicated that Plaintiff could sit for at least two hours, but could stand or walk for less than two hours. (AR 638) (emphasis added).  Dr. Hill-Daniel noted that Plaintiff had "lower extremity edema made worse on standing or walking for prolonged periods of time."  (AR 637.)   Dr. Hill-Daniel concluded that Plaintiff's medical condition prevented her from working from September 9, 2009 to December 31, 2009.  (AR 638.)

Dr. Miknowski completed an Internal Medical Examination report on March 28, 2014 based upon his consultative examination of Plaintiff.  (AR 483-486.)  His examination revealed no major abnormalities, with normal reflexes, negative Romberg test, and normal gait.  (AR 484).  Plaintiff had no synovitis, synovial effusion, or deformities of the joints. (AR 485.)   Plaintiff retained full muscle strength and full grip strength, and she could lift ten to fifteen pounds with no restrictions on handling objects, but she refused to attempt a range of motion examination because she claimed it caused "unbearable pain."  (AR 485-486.)  Dr. Miknowski concluded that Plaintiff had moderate restrictions sitting; she could stand 15-20 minutes, and she could walk only two to three blocks. (AR 485.) (emphasis added).

Dr. Grim, a state agency physician, completed a physical RFC assessment on April 2, 2014 (AR 106-108), wherein he found that Plaintiff was able to perform a range of light work, including

_____

[9] The ALJ did not assign weight to the opinions of Drs. Cohen and O'Brien.

lifting twenty pounds occasionally and ten pounds frequently, <u>sitting for six hours in an eight-hour workday, and standing or walking for four hours in an eight-hour workday</u>, and he noted additional postural limitations. (AR 107-108.) (emphasis added). Dr. Grim noted that Plaintiff had stage 3 renal insufficiency and scoliosis, and the MRI showed minimal degenerative disc disease but no central stenosis, while the treating orthopedist found normal leg strength and sensation. (AR 108.)

Dr. Nelson-Desiderio, a state agency physician, completed a physical RFC assessment on September 2, 2014, where he found that Plaintiff was able to perform light work, including <u>sitting for about six hours in an eight-hour day and standing or walking for about six hours in an eight-hour day</u>, with additional postural and environmental limitations. (AR 118-120.) (emphasis added). Dr. Nelson-Desiderio acknowledged that Plaintiff would have limitations from musculoskeletal pain and fatigue resulting from kidney disease, but he noted also that Plaintiff's renal ultrasound showed no hydronephrosis or kidney stones, and furthermore, her renal insufficiency from hypertension and blood pressure was "being controlled, [and there were] no urinary symptoms, [and only] occasional low back and flank pain[.]" (AR 120.)

The ALJ gave "some weight" to the opinion of Plaintiff's treating physician, Dr. Hill-Daniel, that Plaintiff "can "lift and carry 25 pounds, but only 10 pounds frequently," and "can sit for at least 2 hours, but can stand and walk for less than 2 hours." (AR 55.) The ALJ noted that Dr. Hill-Daniel was Plaintiff's "treating source," and as such, the doctor was "well placed to provide an opinion as to the [Plaintiff's] symptoms and limitations." (AR 55.) Finally, the ALJ concluded that Dr. Hill-Daniel's "opinion is consistent with the objective findings and the claimant's conservative course of treatment during the period at issue," and the ALJ referenced some exhibit numbers. (AR 55.)

Plaintiff argues that while the ALJ found that treating physician Dr. Hill-Daniel was "well placed to provide an opinion," and that "his opinion was consistent with the objective findings . . . " (AR 55), Dr. Hill-Daniel's assessment was given only "some" weight, which is the same weight given to Dr. Grim, even though the ALJ found that Dr.'s Grim's assessment of Plaintiff was not wholly appropriate, particularly with respect to her "ability to sit, stand, walk, and engage in postural activities." (AR 55.) This Court finds that the ALJ's statement about Dr. Hill-Daniel's opinion being consistent with objective findings but also consistent with conservative treatment is confusing. Furthermore, the ALJ proffered no indication why she gave the most weight to Dr. Nelson-Desiderio's opinion that "the claimant was able to perform light work, sit, stand, and walk for 6 hours, . . ." other than that this doctor is "familiar with the Social Security program, and his opinion is generally consistent with the medical evidence." (AR 55.)

While the ALJ does not have to afford the treating physician's opinions controlling weight, if the ALJ does not treat them as controlling, she must explain how they are contradicted by substantial evidence and why she is not following them, and that is where the ALJ's Decision fails. In this case, there is a difference of opinion among the medical professionals as to limits on the Plaintiff's capabilities involving sitting, standing and walking, which are at the heart of her ability to perform light work. The ALJ gave three physicians' opinions "some" weight, and then indicated that more weight was given to one. The ALJ failed to clearly explain how Dr. Hill-Daniel's opinion was contradicted by substantial evidence and why she gave greater weight to the opinion of the non-treating physician, Dr. Nelson-Deisderio (and even why Dr. Grim's assessment was given less weight). In contrast, the ALJ did explain why "little" weight was given to Dr. Miknowski's opinion.

If the ALJ "rejects the opinion of a treating physician, [he shall] explain his reasons for doing so." *Butler*, 353 F.3d at 1003 (citation omitted). The ALJ's reasons must be "sufficiently specific to make clear to [the court]" why the ALJ assigned that weight. SSR 96-2 [Policy Interpretation Ruling Titles II and XVI: Giving Controlling Weight to Treating Source Medical Opinions], 1996 WL 374188 at *5. *See, e.g., Perkins v. Berryhill*, 379 F. Supp. 3d 1, 5-6 (D.D.C. 2019) (discussing the ALJ's failure to explain sufficiently his reasoning for declining to accord the treating physician's opinion controlling weight); *Butler*, 353 F.3d at 1003 (emphasizing that it is the ALJ who should explain the weight attached to the treating physician's conclusions and his reasons for doing so).

While the ALJ need not encompass the entirety of her analysis in any paragraph of her decision, she must provide a sufficient basis for this Court to understand her reasoning when viewing the decision as a whole, which was not done here. *Compare Callaway v. Berryhill*, 292 F. Supp. 3d 289, 296 (D.D.C. 2018) (where "sufficient information [was] provided for the Court to understand [the ALJ's] reasoning"). The ALJ needs to "buil[d] a logical bridge from the evidence to [her] conclusion by thoroughly evaluating the evidence, explaining which evidence was persuasive and supported by the record, and comparing the objective medical evidence to Plaintiff's subjective testimony." *Cunningham v. Colvin*, 46 F. Supp. 3d 26, 36 (D.D.C. 2014) (internal quotation marks and quotation omitted).

In the instant case, the ALJ merely referenced the same set of exhibits (by numbers only, without any explanation of why they are being referenced) with regard to both Dr. Nelson-Desiderio and Dr. Hill-Daniel. The exhibits are: 1F/7 (AR 339), where the Plaintiff had a walk-in medical visit to obtain a refill of medication because of swelling in her legs; 1F/64 (AR 386), which indicated that Plaintiff had "mild medical renal disease;" 2F/18 (AR 423), relating to a

medical visit with Dr. Cohen to evaluate Plaintiff's chronic kidney disease; 2F/32-36 (AR 436-441), which are various medical records discussing conservative treatment for Plaintiff's lower back pain/scoliosis, spinal MRI results showing scoliosis, as well as a notation in her social history about brief walks and short bike rides; 5F/6 (AR 494), indicating a normal result for the kidney ultrasound; and 8F/10 (AR 648), a notation that Plaintiff was ambulatory with a steady gait on July 21, 2011. The Court notes that the ALJ did discuss some of these exhibits in other portions of the Decision. (AR 54-55.) This record evidence [or some of it] may be relevant to Plaintiff's capacity to sit, stand and walk [and accordingly, perform light work]; however, it is not the function of this Court to reweigh the evidence.

While the ALJ indicated she gave "some" weight to both Dr. Hill-Daniel and Dr. Nelson-Desiderio, the ALJ ultimately failed to explain why she gave more weight to Dr. Nelson-Desiderio than to Plaintiff's treating physician, and she failed to provide an explanation of how the medical evidence contradicts Dr. Hill-Daniel's proffered limitations on Plaintiff's ability to sit, walk and stand for longer periods of time. Accordingly, because the ALJ failed to "build a logical bridge" from the evidence to the weight she gave to the medical professionals' opinions, the case is remanded to the SSA for reevaluation of the record evidence with regard to the weight given to Plaintiff's treating physician.

**B.    The ALJ's Assessment of Plaintiff's Testimony was Supported by Substantial Evidence**

Plaintiff alleges that the ALJ's finding that her "statements concerning the intensity, persistence and limiting effects of [her] symptoms were not entirely consistent with  the medical evidence and other evidence in the record." (AR 54.) Defendant asserts that the "credibility determination is solely within the realm of the ALJ." Def.'s Mot., ECF No. 12, at 16; *see Grant*

*v. Astrue*, 857 F. Supp. 2d 146, 156-157 (D.D.C. 2012) (noting that the ALJ's assessment of credibility is entitled to "great weight and deference, since he had the opportunity to observe the witness's demeanor."). There is a two-step process to determine "whether a claimant's symptoms affect her ability to perform basic work activities." *Callaway v. Berryhill*, 292 F. Supp. 3d 289, 297 (D.D.C. 2018) (citing 20 C.F.R. Section 404.1529). The first step requires that the ALJ determine whether the claimant's medically determinable impairments could reasonably be expected to produce the alleged subjective symptoms. *Callaway*, 292 F. Supp. 3d at 297; 20 C.F.R. Section 404.1529(a)-(b). The second step requires that the ALJ evaluate the intensity and persistence of the symptoms and determine the extent to which the symptoms limit the claimant's capacity to work. *Callaway*, 292 F. Supp. 3d at 297; 20 C.F.R. Section 404.1529(c)(1). A claimant's allegations alone do not establish disability. *See* 20 C.F.R. Section 404.1529.

While an ALJ may not reject a claimant's statements about pain "solely because they are not substantiated by objective medical evidence," the ALJ may consider "whether there are any inconsistencies in the evidence and the extent to which there are any conflicts between [the claimant's] statements and the rest of the evidence." *Butler v. Barnhart*, 353 F.3d 992, 1004-1005 (D.C. Cir. 2004)

Plaintiff challenges the ALJ's assessment on several issues: (1) that her "conservative" treatment plan by her treating physicians was not indicative of the severity of her pain; (2) that her ability to walk with a normal gait and have full muscle strength is not supported by the ALJ's citations to the record; and (3) that her reference to a bike ride in the "social history" portion of her medical records was taken out of context. Defendant argues that substantial evidence supports the ALJ's assessment of Plaintiff's subjective complaints.

Regarding Plaintiff's scoliosis, the ALJ found that the medical evidence revealed "moderate scoliosis," although the prescribed treatment has been consistently "conservative," and she noted that Plaintiff's scoliosis was "very well managed with physical therapy and did not warrant surgical intervention." (AR 54.) These findings by the ALJ are supported by substantial evidence in the record. Plaintiff counters that her suggested treatment plan for scoliosis was conservative because "[undergoing] surgery would be quite an undertaking and may not, at [that] time, [have] be[en] in [Plaintiff's] best interest due to the complexity and magnitude of surgery." Pl.'s Reply, ECF No. 14, at 7 (citing AR 441). The ALJ noted further that Plaintiff was told to "avoid NSAID pain relievers," and concluded that this may indicate that Plaintiff's pain was not "as severe as [Plaintiff] has alleged." (AR 54). Plaintiff points out that the prohibition against NSAIDs stemmed from her kidney issues. Pl.'s Mot., ECF No. 11, at 14-15; Pl.'s Reply, ECF No. 14, at 4.[10]

The ALJ referenced notations from the record that indicate Plaintiff walked with a "normal gait." (AR 54.) While the reference cited by the ALJ (AR 648) is a nursing assessment that Plaintiff was "ambulatory with a steady gait," there are treatment notes from that same medical visit that indicate Plaintiff's "[g]ait [was] normal" on examination. (AR 646.) The ALJ mentioned Plaintiff's full muscle strength (AR 54), relying notations regarding Plaintiff's 5/5 strength and normal sensation, and a "social history" notation that Plaintiff's activities included brief walks and short bike rides. (AR 441.) The ALJ noted that Plaintiff lived in a third floor apartment and climbed multiple flights of stairs (AR 55). Plaintiff argues the ALJ misconstrued evidence; *see* Pl.'s Mot., ECF No. 11 at 16 (arguing that Plaintiff 's reference to bike riding referred to her prior

---

[10] As previously noted, in 2010, Plaintiff was prescribed ibuprofen for her scoliosis (AR 353, 355), and in 2011, she was prescribed acetaminophen. (AR 334.)

activities), Pl.'s Reply, ECF No. 14, at 6 (noting testimony about the 9 steps to Plaintiff's third floor apartment).  The Court finds however that there is no dispute that the evidence relied upon by the ALJ is in the record.

In focusing on Plaintiff's kidney disease, the ALJ looked to medical evidence from August 2011, indicating mild kidney disease, and the "minimal treatment" other than monitoring that Plaintiff received "from the onset date through the date last insured." (AR 54.)  The ALJ focused also on Plaintiff's normal kidney ultrasound in October 2012.  (AR 54.)  The ALJ acknowledged that Plaintiff had stage 3 kidney disease, but she noted Plaintiff's stable creatinine levels, and she mentioned that Plaintiff's denial of any urinary symptoms [contained in the medical records] contradicted her testimony at the hearing.  Plaintiff argued that the urinary urgency related to her 2016 testimony as opposed to in 2010 or 2012, when Plaintiff denied urinary urgency.  Pl.'s Reply, ECF No. 14, at 4  Overall, the ALJ weighed the evidence and concluded that the Plaintiff's statements as to the intensity, persistence and limiting effects of her symptoms were not entirely consistent with the medical evidence and other record evidence.   Despite Plaintiff's protestations and post hoc explanations about her social history and urinary urgency, this Court finds that the ALJ's credibility determination is supported by substantial evidence.  Accordingly, the Plaintiff's Motion is denied on this grounds.

### C. The ALJ's RFC Finding was Supported by Substantial Evidence

Plaintiff argues that the ALJ's RFC finding was not supported by substantial evidence, with a focus on the ALJ's analysis of Ms. McCormick's kidney disease.  Plaintiff argues that the increase in the severity of her diagnosis – from "mild" kidney disease in 2011 to stage three kidney disease in October 2012 – on its face supports her claim of disability.  Pl.'s Mot., ECF No. 11, at 17-18.  Plaintiff argues further that while her creatinine levels were noted to be stable, they were

also noted to be elevated. Pl.'s Mot., ECF No. 11, at 18; Pl's Reply, ECF No. 14, at 8-9, and while her kidney ultrasound in October 2012 was normal, "her kidney function was not normal as demonstrated by her elevated creatinine levels . . . " Pl.'s Mot., ECF No. 11, at 18. The Court finds that these points argued by Plaintiff are incorporated into the ALJ's analysis. *See* Section III.B. above; *see also* AR 423 (referenced by the ALJ) (recognizing elevated serum creatinine of 1.5, as of 2008, and creatinine that has been stable since then, per Plaintiff).

Plaintiff disagrees next with the ALJ's characterization of Plaintiff's treatment as "minimal" insofar as she was "placed on Furosemide, which is used to treat edema in people with kidney disease" and she was "advised to follow a low sodium diet and to avoid NSAIDs and herbal supplements," and she was put on blood pressure medications. Pl.'s Mot., ECF No. 11, at 18. The record indicates that Plaintiff's kidney disease was treated through a combination of diet and medication (including medication for her blood pressure), and without dialysis or surgical intervention. The Court finds that the ALJ's reference to this as "minimal" treatment is not inconsistent with the record evidence.

The Court finds that the ALJ's consideration of Plaintiff's kidney functioning in formulating the RFC was supported by substantial record evidence, and accordingly, there is no need to re-weigh the evidence.[11] "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] or the [Commissioner's] designate, the ALJ." *Smith v. Astrue*, 534 F. Supp. 2d 121, 132 (D.D.C. 2008) (quoting *Walker v. Bowen*, 834 F. 2d 635, 640 (7th Cir. 1987)). Accordingly, Plaintiff's claim that the ALJ's RFC finding was not supported by substantial evidence is denied.

---

[11] Defendant notes that "Dr. Desidierio also evaluated the objective evidence of Plaintiff's kidney functioning and found that, although Plaintiff would have some limitations from her kidney disease, Plaintiff retained the capacity to perform light work." (AR 118-120.)

**D. The ALJ Sufficiently Developed the Record to Issue a Decision**

An ALJ in a Social Security benefits hearing is obligated to develop the record adequately, *Prince v. Berryhill*, 304 F. Supp. 3d 281, 287 (D. Conn. 2018) (citation omitted), and this obligation exists even when a claimant is represented by counsel. *See Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996) (an ALJ "must [her]self affirmatively develop the record.") (quotation omitted). While the ALJ has a duty to develop the record, the Plaintiff bears responsibility for developing the record by producing evidence that relates to her claim of disability. *Jackson v. Berryhill*, 268 F. Supp. 3d 115, 132 (D.D.C. 2017) (citations omitted).

During the Administrative Hearing, Plaintiff testified that her kidney disease caused her to wet on herself out in public, and she was vomiting a lot. (AR 79.) When asked by the ALJ if she notified any of her doctors of these symptoms, Plaintiff stated that she told her private physician, Dr. Cleveland Williams. (AR 80.) The ALJ indicated that he did not have records or treatment notes that would support that testimony, and Plaintiff's counsel asked if the record could be left open for a short amount of time. (AR 81.) The ALJ did not permit the record to remain open as "[t]his [was] an old DLI," but the ALJ indicated that Plaintiff could "send anything in up until the day [the ALJ] issue[d] a decision[,] [and] . . . [i]t will be looked at and if the decision has to be modified, we'll modify it." (AR 81.)

Plaintiff contests generally (without providing any case law support) that the ALJ's offer to receive documentation up to the date the decision was issued – over two months after the hearing – was insufficient to satisfy the obligation that the ALJ develop the record adequately. Where the ALJ has provided Plaintiff with sufficient opportunity to submit evidence, the ALJ fulfills her duty by ruling on the evidence that is available. *Hynes ex rel. Davis v. Astrue*, No. CIV. A. 01-1231 RBW, 2009 WL 1312545, at *4 (D.D.C. May 12, 2009) (citing *Musgrave v. Sullivan*, 966 F.2d

1371, 1377 (10th Cir. 1992)). Furthermore, it is the claimant's burden to prove that any error in developing the record was harmful. *Clark v. Astrue*, 826 F. Supp. 2d 13, 24 (D.D.C. 2011) ("reversal for 'failure to develop the record is only warranted where such failure is unfair or prejudicial'") (quoting *Smith v. Astrue*, 534 F. Supp. 2d 121, 134 (D.D.C. 2008)).

Defendant argues that, in this case, there was "more than ample time for Plaintiff to submit evidence relevant to the disability issue in question" as Plaintiff had the burden to prove that she was disabled prior to December 31, 2012, and the administrative hearing did not occur until December 2016. Def.'s Mot., ECF No. 12, at 20-21. Defendant submits that "Plaintiff has provided no explanation why she was unable to timely present evidence that had been in existence for many years [and] . . . the ALJ informed Plaintiff at the hearing that she could present evidence up until the day she issued her decision," which was two months after the hearing. Def.'s Mot., ECF No. 12, at 21. Moreover, "Plaintiff has provided no explanation why the additional two months . . . were insufficient to obtain any further evidence, and [had] still not presented the records in question [by the time this issue was briefed] to demonstrate any prejudice[.]" *Id.* The Court finds that Plaintiff had ample time to present evidence about her claim, and the ALJ's offer to accept additional evidence up to the time of her decision alleviated any possible prejudice to Plaintiff as it permitted her time to submit any additional medical records. Accordingly, Plaintiff's claim that the ALJ did not sufficiently develop the record is denied.

### IV. Conclusion

Upon consideration of Plaintiff's [11] Motion for Judgment of Reversal; Defendant's [12/13] [Consolidated] Motion for Judgment of Affirmance and Opposition to Plaintiff's Motion for Judgment of Reversal; and Plaintiff's [14] Reply; and the Administrative Record herein, for the reasons explained herein and based on the applicable legal standard of review, the Court shall

GRANT IN PART and DENY IN PART Plaintiff's [11] Motion for Judgment of Reversal and DENY Defendant's [12] Motion for Judgment of Affirmance, with the effect that the case shall be REMANDED to the SSA for reconsideration of the following issue raised by Plaintiff - reevaluation of the record evidence with regard to the weight given to opinion of Plaintiff's treating physician.

The ALJ's Decision with regard to the following issues is upheld: (1) the ALJ's assessment of Plaintiff's testimony; (2) the ALJ's RFC finding; and (3) the sufficient development of the record.

A separate Order accompanies this Memorandum Opinion.


DATED: June 25, 2021 _____/s/_____
COLLEEN KOLLAR-KOTELLY
UITED STATES DISTRICT JUDGE